[No. H009415. Sixth Dist. Feb. 23, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CLINTON ANTHONY MARTIN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication except as to parts I and III.

**COUNSEL**

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Mark S. Howell and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.**—Defendant Clinton Anthony Martin appeals from the judgment entered after his conviction for first degree murder. He charges instructional and other trial court error. We affirm.

## Statement of Procedure

A jury convicted the 18-year-old defendant of murder in the first degree and found true the enhancements as alleged in the information: discharge of a firearm at an occupied motor vehicle and criminal street gang activity. (Pen. Code, §§ 187; 12022.5, subd. (b); 186.22, subd. (b).)[1] He was sentenced to a term of 25 years to life in state prison with a consecutive 5-year term for the firearm enhancement and no parole for a minimum of 15 years for the street gang enhancement.[2]

## Statement of Facts

Viewed in accordance with the usual rules on appeal (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), the record shows: On the evening of September 1, 1990, David Brownson and his passengers Debbie Z. and Starla R. drove his brown Chevrolet Camaro to the parking lot of the Saratoga Lanes bowling alley. The weekend before, Brownson and Debbie had witnessed an altercation in the parking lot, where an acquaintance of his, Rob Tilney, had been beaten and kicked by a group of young men after Tilney was accused by defendant Martin of "bad-mouthing" him. At the time, Brownson approached Tilney but was told to leave by defendant and another. The fight was eventually broken up and the group of young men with defendant left in several vehicles: a black truck, a Fiero and an Escort.

As they arrived on September 1, Brownson and Debbie noticed some of the same cars leaving the Saratoga Lanes parking lot and decided to follow them, either to get their license plate numbers or to see where they were going. Defendant was in the front passenger seat of a car driven by codefendant Dameon Collins. Three young women (Wendy F., Winonah M. and Heather M.) were in the back seat. When someone in defendant's group noticed the brown Camaro following them, they all pulled off into a side street, waited for the car to pass and then began following it. A high-speed chase began, continuing for several miles at speeds up to 80 miles per hour. Defendant ordered Collins (the driver) to catch the Camaro. As they pulled alongside it, defendant took out Collins's .357 revolver and fired three times at the Camaro. One shot hit Debbie in the head and killed her.

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

[2]Defendant was tried with codefendant Dameon Collins, but Collins is not a party to this appeal.

Defendant and his group of friends called themselves "JPK" or "Just Peeling Kaps."[3] According to evidence presented at trial, they claimed allegiance to the color blue and considered themselves a "Crip" gang. Members of the gang were listed on graffiti near defendant's home and pledged themselves to friendship and protection.[4] The night of September 1, the group gathered at one of the young women's houses to meet a new member, codefendant Collins. Certain rituals were performed, including holding a loaded gun to Collins and requiring him to pledge loyalty. Collins then showed defendant the .357 gun he kept in his car. Later in the evening, the group, in several cars and a truck, stopped at a Chevron service station, where they encountered a group of four or five young men wearing red clothing and insignia, indicating a rival gang (Bloods). A verbal argument began between the two groups, and led to pushing and shoving. The station manager eventually broke up the fight and told the groups to leave. As they were leaving, taunts were exchanged, including " 'Don't mess with JPK,' " " 'Meet us at Saratoga Lanes' "; and "Alviso," "XIV."

The JPK vehicles went to Saratoga Lanes to await their rivals. They tired of waiting and left the parking lot. According to various JPK members, when they saw Brownson's Camaro following them, they assumed it was the Alviso gang, who had also been driving a Camaro. Several testified that they believed the occupants of the Camaro pointed threateningly at them and shouted profanities, but they also admitted that Brownson's Camaro had partially tinted windows making it nearly impossible to see inside. At trial, Heather M., one of the occupants of the car defendant was in, said she saw a gun or something that looked like one in the Camaro. Apparently during the chase, defendant yelled: " 'They [sic] got a gun.' " However, Heather's postincident interview with the police indicated she did not see the gun herself, but was only repeating what someone in another car said when the caravan pulled over to begin following the Camaro. Other statements made in postincident interviews by the police with JPK members revealed that defendant shouted: " 'We've got them' " as the cars drew abreast and then said, " 'I wonder if I got'em' " after the shots were fired. The victims denied having a weapon in their car and none was ever found.

After the shooting, the JPK group gathered at defendant's house and defendant admitted the shooting. The next evening, he and several others dumped the gun in a percolator pond. A police search of defendant's home on September 3 found a .22-caliber rifle and ammunition. The .357 revolver

---

[3]They also claimed to call themselves "Just Plain Kids."

[4]About a week prior to the day of the charged murder, defendant and several members of the group beat with a skateboard and a metal pipe a man on the street near defendant's house who allegedly yelled racial epithets at defendant.

with three spent casings and other live cartridges was later retrieved from the pond.

*Discussion*

## I.  *CALJIC No. 5.54\**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## II.  *Gang Activity Enhancement*

■  Next, defendant claims he was denied a fair trial by the trial court's refusal to bifurcate trial of the section 186.22, subdivision (b) enhancement for gang activity. Prior to trial, the court had denied the defense motion to bifurcate,[7] stating in part: "I think the argument that it's part and parcel of the motive and the circumstances surrounding the charged offense are such that it's so inexorably intertwined that a motion to, in effect, bifurcate that issue would not be appropriate." Defendant presents numerous reasons for his position, including the plain language of the statute, the irrelevancy of evidence of motive, the inflammatory, prejudicial nature of the gang activity evidence and the failure of the trial court to weigh probity versus prejudice. His points are without merit.

Section 186.22, subdivision (b)(1) (formerly subd. (b)) provides in part that "Except as provided in paragraph (2), any person who is convicted of a felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she had been convicted, be punished by an additional term of one, two, or three years at the court's discretion." Paragraph (2) mandates no parole for a minimum of 15 years for a life sentence. Other subdivisions define criminal street gang and enumerate the offenses demonstrating a pattern of criminal gang activity.

---

\*See footnote, *ante*, page 76.

[7]Defendant joined codefendant's motion to bifurcate on the grounds that the underlying felony must be proved first and that the enhancement evidence was unduly prejudicial. The prosecutor argued that the same witnesses would testify and that the same evidence was involved, especially to show motive for the homicide. The trial court denied the motion to bifurcate but reserved its ruling on specific testimony and requested the prosecutor to provide a list of the incidents involved in proving gang activity for purposes of the enhancement allegation. The court later sustained defendant's objection to one incident on the list.

Defendant first attempts to read the statute's prescription for enhancement "upon conviction of that felony" to mean the enhancement allegations can be tried only after the felony is established. But the more logical reading of the phrase means the additional punishment is imposed after there has been a conviction on the main felony. We find nothing in this section or any other section of the Penal Code that requires a separate proceeding for a gang activity enhancement. In the court below, defendants relied on *People* v. *Bracamonte* (1981) 119 Cal.App.3d 644 [174 Cal.Rptr. 191] by analogy. But certainly Bracamonte's authorization of bifurcation for the trial of enhancement allegations of prior convictions differs markedly from the enhancement at issue here. The evidence of a prior conviction is separate and unrelated to the underlying crime. Testimony is from different witnesses. Here, the same witnesses were testifying to events concerning the gang and the crime itself.

The Attorney General points out that there is no basis in fact for bifurcation of this enhancement because it actually concerns the mental element present in the commission of the underlying crime and thus is similar to enhancements such as section 12022.4 (during commission of a felony, furnishing a firearm to another for the purpose of aiding, abetting or enabling that person to commit a felony), section 12022.6 (in the commission of a felony taking property of a certain value with the intent to cause such taking), section 12022.7 (in the commission of a felony, with intent to inflict such injury, inflicting great bodily injury), or section 12022.9 (in the commission of a felony, knowing a victim is pregnant, with intent to inflict injury, inflicting injury resulting in termination of the pregnancy). We agree.

Here, the prosecution was required to prove the underlying felony was committed: 1) for the benefit of, at the direction of, or in association with any criminal street gang, and 2) with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); see also *People* v. *Gamez* (1991) 235 Cal.App.3d 957, 974 [286 Cal.Rptr. 894].) Clearly, the same witnesses (gang members) and much of the same evidence used to prove the felony (here, the homicide) were also relevant to establish the circumstances and intent of the killing.

Contrary to defendant's assertion, the motive here was relevant and important, both to the actual crime committed (first or second degree murder or manslaughter) and to the requisite intent for the enhancement. Case law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. (*People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 498-499 [175 Cal.Rptr. 445]; see also *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 140 [185 Cal.Rptr. 314].) The testimony about defendant's gang involvement and related activities sheds light on his claim the Camaro contained people who intended harm and his

defense of seeing a gun in the other car.[8] There was no need for, and in fact, no reasonable way to bifurcate the enhancement allegation.

Defendant's further assertions that Evidence Code section 1101, subdivision (b) and its cross-admissibility standard prohibited the evidence and that the instruction on intent prejudiced him are incorrect.[9] He cites, inter alia, *Williams* v. *Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699] and *Henry* v. *Estelle* (9th Cir. 1993) 993 F.2d 1423.[10] But evidence of defendant's gang-related acts revealed circumstances of the homicide and were necessary to prove the enhancement; the evidence was not directed at his disposition to commit other crimes. Nor did the instructions given on the requisite intent for the crimes charged unfairly allow the jury to determine general bad intent because of gang affiliation.[11]

The trial court's remarks indicate it considered defendant's objections, implicitly weighed the prejudice versus probative value, and appropriately concluded the evidence was so inextricably intertwined as to mandate a single proceeding.[12]

---

[8]Defendant does not specifically challenge any of the five acts presented by the prosecutor. They include an incident the night of the shooting (holding a gun on codefendant Collins as a loyalty pledge) and the Saratoga Lanes beating of Rob Tilney, prompting the victims' attempt to follow the gang. Both are directly relevant to the homicide. Two other acts show gun possession for gang protection. The remaining act is the gang's beating of a person near defendant's house for reasons of protection and gang loyalty.

[9]Evidence Code section 1101, subdivision (b) provides in pertinent part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act."

[10]The People respond that section 954.1, added by Proposition 115, abrogated this prohibition. (See also *Frank* v. *Superior Court* (1989) 48 Cal.3d 632 [257 Cal.Rptr. 550, 770 P.2d 1119].)

[11]"Evidence has been introduced for the purpose of showing that the defendant committed the criminal street gang allegation. Such evidence [if] believed was not received, and may not be considered by you to pro[ve] that the defendant is a person of bad character, or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show, one, the existence of the intent with which is a necessary element of the crime charged, and two, the motive for the commission of the crime charged."

[12]The trial court initially noted the legislative efforts to suppress gang-related activity and the prosecutor's emphasis on motive as compelling reasons to deny the motion to bifurcate. However, the court went on to consider the prejudice versus probative value of each specific act that the prosecutor planned to introduce evidence on. In considering Evidence Code section 352, the trial court specifically retained discretion to consider undue prejudice if other evidence of gang activity was presented. Codefendant's counsel admitted there was no undue prejudice from evidence of acts on the night of the shooting or one week prior. Prejudice from other evidence was discussed and weighed in response to the prosecutor's specific list and in

### III.   *CALJIC No. 8.73\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### *Disposition*

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied March 24, 1994, and appellant's petition for review by the Supreme Court was denied May 19, 1994.

---

an earlier discussion concerning acts necessary to show a pattern of criminal conduct for gang activity.

\*See footnote, *ante*, page 76.